**BRIAN DONESLEY ISB# 2313**
**Attorney at Law**
**604 North 16th Street**
**P.O. Box 419**
**Boise, Idaho  83701-0419**
**Telephone  (208) 343-3851**
**Facsimile (208) 343-4188**

**Attorney for Plaintiff**

FEE PAID
RCPT #6800

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **CHRISTOPHER T. BERRY**<br><br>**Plaintiff,**<br><br>v.<br><br>**CITY OF BOISE, LARRY PAULSON, JIM MAXSON, MIKE WEBB, GARY COMPTON, WILLIAM L. M. NARY, and SUSAN LYNN MIMURA, each individually and in their official capacities,**<br><br>**Defendants.** | CASE NO. _____<br><br>**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>**Filing Fee ($150.00)** |

COMES NOW, Plaintiff, CHRISTOPHER T. BERRY, by and through his attorney of record, BRIAN DONESLEY, and for his claim against the Defendants does complain and allege as follows:

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 1**

ORIGINAL

## JURISDICTION

Jurisdiction exists pursuant to 42 USC § 1983 and 42 USC § 1988 (civil rights); and 28 USC § 1331 (federal question); and 28 USC § 1367 (supplemental jurisdiction).

## FACTS

1.      Plaintiff, Christopher T. Berry, at all times relevant, is and has been a resident of Boise, Ada County, Idaho.   At the time of the wrongful termination of Plaintiffs' employment, he was employed as police officer by Defendant The City of Boise.

2.      Defendant The City of Boise is a lawful municipal corporation formed and constituted under the laws under the State of Idaho and amenable to suit under I.C. 50-301, located at Ada County, Idaho.

3.      Defendant Larry Paulson, at all times relevant, was an employee or agent of Defendant The City of Boise, employed as Chief of Police.

4.      Defendant Jim Maxson, at all times relevant, was an employee or agent of Defendant The City of Boise, employed as Lieutenant of Police.

5.      Defendant Mike Webb, at all times relevant, was an employee or agent of Defendant The City of Boise, employed as Lieutenant of Police.

6.      Defendant Gary Compton, at all times relevant, was an employee or agent of Defendant The City of Boise, employed as Sergeant of Police.

7.      Defendant William L. M. Nary, at all times relevant, was an employee or agent of Defendant The City of Boise, employed as Assistant City Attorney.

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 2**

8.      Defendant Susan Lynn Mimura, at all times relevant, was an employee or agent of Defendant The City of Boise, employed as City Attorney.

9.      Each individual Defendant was, at all times relevant, acting within the scope of employment, subject to the supervision, control and direction of Defendant The City of Boise.  The acts, conduct, breaches, damages, losses and liabilities attributable to the individual Defendants individually are imputed to and are the responsibility of the Defendant City, under the doctrine of respondent superior and were done under the color of law, except as otherwise provided herein or as allowed by law.

10.     The actions of individual Defendants were done pursuant to City custom or policy.

11.     Plaintiff had been employed at the Department as a Police Officer for approximately two and one half years, when he was notified, on February 18, 1998, that his employment was terminated, by a letter from the Chief of Police, Larry Paulson.  That letter referenced a prior letter, dated February 12, 1998, which provided a detailing of "sustained allegations."

12.     The allegations were enumerated A through I, as follow:

ALLEGATION A: Performance, F.M.2.102.

        Officer Berry knowingly made a traffic stop on December 16, 1997, without notifying dispatch in direct violation of instruction and counseling he had previously been given by Sergeant Compton and Lieutenant Webb.

ALLEGATION B: Insubordination, F.M.2.304.

        Officer Berry made a traffic stop without checking out with dispatch.  Sergeant Compton asked him why he did not check out and Officer Berry replied that he had

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 3**

checked out on Channel E or 5 and that dispatch did not copy his traffic. Approximately 15 minutes later Sergeant Compton again met with Officer Berry and asked him if he was being totally honest about trying to check out on Channel E. Officer Berry stated that he was being honest. Officer Berry ultimately admitted that he had lied to Sergeant Compton about checking out with dispatch because he was scared. Officer Berry had also lied to Sergeant Compton about a car following him regarding a MDT message he had inadvertently sent to him.

ALLEGATION C: Truthfulness, F.M.11.108.

Officer Berry was not honest in a formal interview with Lieutenant Maxson during the course of an internal investigation regarding Allegations A and B.

ALLEGATION D: Notification of Illness or Injury, F.M.2.106.

On 12-21-97, Officer Berry called Ada County records to report that he was going to be off that evening because of sickness. Sergeant Compton was available at his home that afternoon. His watch commander, Lieutenant Webb is available all the time via his home telephone or department pager.

ALLEGATION E: Performance F.M.2.102.

Sergeant Compton has documented incidents that constitute repeated below standard performance and an unwillingness to change in his interpersonal skills. This is ultimately evidenced in Officer Berry's statements to Sergeant Compton when he is trying to work through an issue that Officer Berry had sent Sergeant Compton an MDT message requesting the sergeant pull a report for him.

ALLEGATION F: Department Records, F.M.2.115

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 4**

Officer Berry completed an official police report that included statements that were misleading and false.

ALLEGATION G: Performance F.M.2.102

Officer Berry had no right to further detain Dennis Brant beyond the initial questioning. Officer Berry had no reasonable suspicion to pat search Brant and did not have the right to go through his wallet. Later in the contact, Officer Berry observed the ignition was punched out of the vehicle Brant was driving. That would have given him suspicion to continue a line of question about the issue. Officer Berry ran a registration check on the vehicle and it came back registered to Brant, which eliminated the suspicion that the vehicle may have been stolen.

ALLEGATION H: Conformance to Laws F.M.2.302.

Officer Berry recorded false and misleading information in his arrest report that was filed and used by the Ada County Prosecutor in criminal court proceedings against Dennis R. Brant in violation of ISC 18-3201 or 18-2602.

ALLEGATION I: Conformance to Laws F.M.2.302

Officer Berry testified falsely during a preliminary hearing in violation of ISC 18-5401, 5406 and 5408.

13.    The grievance was timely filed on February 23,1998.

14.    The Union Grievance Committee approved the grievance and sent it to the Chief of Police timely.

15.    The Chief of Police responded to the grievance in writing, denying the grievance. A Hearing Officer was appointed by the City and instructed to proceed with hearing

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 5**

16.    Plaintiff had received commendations and standard or above standard ratings previous to his termination, without exception.  He was an aggressive officer whose initiative was recognized favorably.  There had been no previously alleged incidents of: unsatisfactory performance or any kind of alleged; use of unlawful police procedure; challenges to evidentiary or arrest procedures in suppression hearings; or accusations of lying, falsifying reports or making false or misleading statements in reports or testimony.

17.    On 12-15-97, Plaintiff checked out at a traffic stop at Liberty and Emerald.  His supervisor, Sergeant Compton, spoke to Plaintiff at the scene about traffic safety issues relating to checking out at a traffic stop on his hand held radio.

18.    On 12-16-97, Plaintiff made a traffic stop at a Maverick station on Ustick and Cloverdale.  The driver got out of his vehicle.  Plaintiff got out of his vehicle in a hurry, for traffic safety purposes, without checking out with dispatch.  Sergeant Compton arrived immediately and checked out on his radio for both himself and Plaintiff.  When asked, Plaintiff explained that he "tried" to check out.  He explained the he had been on the wrong channel had thrown his mic. down when the suspect exited his vehicle, and the he did not get checked out.

19.    Sergeant Compton, at that time, told Plaintiff to never again exit his police vehicle at a traffic stop without first checking out with dispatch.  Plaintiff had never been given that instruction before.

20.    There is no official policy requiring checking out with dispatch before making a traffic stop, in all circumstances.  This is a matter of discretion, based upon officers safety considerations, as taught by the Field Training Program (FTO) and sergeants in the field.

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 6**

21.    There is no evidence that Plaintiff had previously been counseled or ordered never to exit his police vehicle at a traffic stop without first checking out with dispatch.

22.    Approximately fifteen minutes later, Sergeant Compton asked Plaintiff if he had been totally honest about trying to check out on the car radio.  Officer Berry said he was honest and that he had "tried" to check.

23.    Subsequently, in an investigative interview, after having been cautioned by a union representative assisting Plaintiff that he would be fired if he did not agree with Lieutenant Maxson, the Office of Professional Standards Senior Investigator, Plaintiff made conciliatory statements.  Such statements did not, constitute an admission of having lied to Sergeant Compton about checking out.

24.    Also, shortly after the traffic stop, Plaintiff had sent a mobile data terminal (MDT) message to Sergeant Compton to explain that somebody was following Plaintiff in a car.  Sergeant Compton later accused Plaintiff of lying about the event and of having sent Sergeant Compton the MDT message inadvertently, intending that the message would be insulting to Sergeant Compton.  The message was sent inadvertently, according to Officer Berry, because, though Officer Berry originally intended to send the message to Sergeant Compton, he changed his mind and sent it to another officer, sending it to Sergeant Compton only by mistake.  The message was not intended to insult Sergeant Compton and only described events which occurred.

25.    Interviews of Plaintiff were conducted by Lieutenant Maxson twice.  The first interview was on 12-23-97, involving Allegations A and B.  The second was on 02-06-98, involving Allegations A, B, C, D, E, F, G, H and I.  Lieutenant Maxson tried to get a

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 7**

confession of lying. Plaintiff was not given required criminal rights warnings, though the reports of his alleged misconduct were discussed with Pat Owen, Deputy Ada County Prosecutor on 12-29-97, and the final investigative reports were submitted by Mr. Nary, Deputy City Attorney, to the Office of the Attorney General, State of Idaho, on 02-05-98.

26.    The letter from Chief Paulson dated 02-12-98, providing notice of "sustained allegations," did not provide adequate detail of the subject matter of the alleged misstatements or falsifications. The letter did not constitute a disciplinary action report (DAR), required by the Boise Police Department Field Manual.

27.    The Boise Police Department Field Manual is written in mandatory terms. Its mandatory provisions are not discretionary. The mandatory procedures in the Field Manual are contractual, not discretionary.

28.    With respect to Allegation C, in the letter of 02-12-98, there was no Administrative Incident Report (AIR) or Special Investigation Report (SIR) done, in violation of F.M.11.104. An AIR and an SIR are required for all Class "A" or Class "B" Complaints.

29.    Allegation B is a Class "A" or "B" Complaint.

30.    Allegation C is a Class "A" or "B" Complaint.

31.    Plaintiff was honest in formal interviews with Lieutenant Maxson, contrary to the allegations of Allegation C.

32.    The Chief of Police testified that his primary concern was "truthfulness," especially with Lieutenant Maxson (Allegation C). Chief Paulson said that he would not have terminated Plaintiff's employment if he had not lied to Lieutenant Maxson.

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 8**

33.    No officer has previously been terminated for failing to notify dispatch before exiting a police vehicle at a traffic stop.

34.    No officer had previously been terminated for not following the notification of illness or injury policy, F.M.2.106.

35.    The Department offered no substantial evidence documenting its alleged "repeated below standard performance" or the alleged "unwillingness to change in his interpersonal skills." No officer has been terminated for such reasons previously.  Sergeant Nakashima confirmed testimony by Sergeant Compton that Plaintiff would respond to constructive criticism and direction.

36.    No officer has previously been terminated for performance failures pursuant to F.M.2.102, in relation to search and seizure procedures.   In this case, Plaintiff had reasonable suspicion to Terry pat the suspect, Brant. The suspect, Brant, offered Plaintiff to show him the contents of his wallet. The search of the Brant vehicle was based upon plain view of contraband.   The search was conducted on that basis under the authorization of Sergeant Compton. Additional authority for the search may have existed pursuant to: consent to search given by Brant; search incident to arrest; and, vehicle inventory search. The events relating to the stop of Brant and search of the Brant vehicle did not constitute a basis for discipline under F.M.2.102.

37.    The official police report filed by Plaintiff in relation to the Brant stop of 08-15-98, did not include substantial, material misleading or false statements knowingly made. The letter of 02-12-98, describing "sustained allegations" in support of the Department's case, does not purport that such falsifications or misstatements were made knowingly.

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 9**

Plaintiff did not knowingly make such false statements.

38.   Likewise, Plaintiff did not record knowingly false and misleading information on the arrest report used in the criminal court proceedings.

39.   Likewise, nor did Plaintiff knowingly testify falsely during the Brant preliminary hearing.  Plaintiff realized, after reviewing the tape of the traffic stop, in preparation for the suppression hearing, that he had forgotten that he had had a brief conversation with a witness (Wiseman), at the scene of the stop.  Plaintiff pointed this out to the prosecuting attorney (Pat Owen), who told him that it was "no big deal."  Any misstatement at the preliminary hearing was insubstantial and immaterial.  No such misstatement was done knowingly.

40.   At hearing, Plaintiff testified personally.  Neither Brant nor Wiseman appeared. The reported statements of Brant and Wiseman were hearsay and, under the circumstances, involving a use immunity agreement having been entered into by the Office of Prosecuting Attorney, with the participation of the Department, in exchange for testimony against Plaintiff in an administrative or criminal proceeding, when combined with the fact that such testimony could support suspect Brant, a known convicted felon, in a probation violation proceeding which arose from this stop, combines to diminish the weight of Brant or Wiseman testimony and to render such testimony insubstantial.

41.   Sergeant Compton testified.  His testimony corroborated Plaintiff's testimony as to events at the traffic stop of Brant, except insofar as Sergeant Compton stated that he did not tell Plaintiff that P.O. LaFramboise stated that he would authorize by telephone a search under the terms of Brant's probation.  Based upon Sergeant Compton's testimony

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 10**

and his admission that the search was conducted under the plain view doctrine, such difference between Sergeant Compton's testimony and Plaintiff's reports is insubstantial. There is no evidence that a knowing misstatement was made by Plaintiff.

42.     Officer Arnold's and Officer Bevier's statements, recorded by Lieutenant Maxson, without tape recordings (in violation of F.M.11.104.) corroborated Plaintiff's version that no search occurred until after the arrival of Sergeant Compton, Officer Arnold and Officer Bevier at the scene at approximately the same time as Ms. Wiseman arrived.

43.     Plaintiff did not search the Brant vehicle until the plain view search was done by Plaintiff, Sergeant Compton, Officer Arnold and Officer Bevier.  A prior look into the vehicle was a vehicle frisk authorized under existing law, Terry v. Ohio, 392 U.S. 1 (1968) and Idaho authority.

44.     The Chief of Police is required to appoint an Office of Professional Standards Senior Investigator.   He did so, appointing Lieutenant Maxson, who served for approximately four years in that capacity.  All disciplinary actions brought through the Office of Professional Standards during the tenure of Chief Paulson had been brought by Lieutenant Maxson.

45.     Among the purposes of F.M.11.206 is to ensure the fair and uniform administration of disciplinary action throughout the Department.  This policy requires consistency of application and the concept of proportionality.   The application of discipline in the termination of Plaintiff, as applied, is disproportionate and, hence, violates F.M.11.206.

46.     F.M.11.205 requires that disciplinary action be initiated through a disciplinary

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 11**

action report (DAR).  No DAR was written with respect to Allegations A through I.  Nor were recommendations from supervisors received, as required in F.M.11.205.  Moreover, Plaintiff was not given the opportunity to explain his position by a written response within three days of a copy of a DAR, since no DAR was provided, in violation of F.M.11.205.

47.    F.M.11.207 requires that a disciplinary order (DO) be used to record all formal disciplinary actions.  A written copy of a DO is required given to the member, with the member provided thirty (30) days after receipt to respond in writing.  No DO was prepared in Allegations A through I.  While the forms provided in (Addendum A) to F.M.11.106, are not mandatory, per se, the alleged DAR and DO presented by the Department, did not comport substantially with the formatting, and the procedures were not followed with respect to notice to Plaintiff and procedures involved.

48.    No officer has previously been terminated from employment for dishonesty or lying, though one other officer was believed to have lied in an internal affairs investigation into allegations involving other conduct.  The termination, in that case, was a result of the conduct, not the lying.

49.    On 12-21-97, Plaintiff called Ada County Records to report that he would be off work that shift because of illness.  He called before the shift started.  The message was given to Sergeant Compton, in writing, before the shift started. This was consistent with procedures actually practiced in the Department.

50.    F.M.2.106, relating to notification of illness or injury is applied and practiced consistent with the conduct of Plaintiff in reporting his illness.

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 12**

51.    Plaintiff did not violate Department Policy by his activities with respect to notifying the Department of illness or injury. (Allegation D and E).

52.    Plaintiff did not violate Department Policy relating to repeated below standard performance and an unwillingness to change in his interpersonal skills in sending Sergeant Compton an MDT message, as discussed herein above. (Allegation E).

53.    There existed between Sergeant Compton and Plaintiff, a personality conflict. Plaintiff complained about the situation, through the chain of command, to Lieutenant Webb, Sergeant Compton's supervisor. No investigation was conducted. No remedial action was taken. Lieutenant Webb testified that he believed the personality conflict was "in his head," referring to Plaintiff. Sergeant Compton, directed insulting behaviors to Plaintiff and participated in joking about alleged illicit use of steroids by Plaintiff, a competitive power lifter. Such conduct was notorious and was insulting to Plaintiff.

54.    Plaintiff sent an MDT message to Sergeant Compton asking him to not team him up with individuals who had made insulting comments about him, alleging use of illegal steroids, jokingly or otherwise. The MDT message was not improper or disrespectful.

55.    Plaintiff was given no warning that his conduct violated standards. He had received no notations on personnel performance charts (PPC), the purpose of which PPCs is to provided a record of unsatisfactory performance or problems, on an immediate and daily basis by supervisors, to provide notice of shortcomings in performance. Plaintiff had not received notice of inadequate performance about: checking out with dispatch on the car radio; actually notifying personally his immediate supervisor upon calling in sick; or, answering "what" on the hand-held radio. Plaintiff had no negative comments in his

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 13**

PPC's or evaluations.

56.    Allegation C of the letter of 02-12-98, which the department purports to be the DAR, does not specify the false statements allegedly made by Plaintiff, nor upon what report Plaintiff was believed to have made knowing false statements. And, Allegation C is not supported by an AIR or a DAR. The substance of Allegation C, relating to alleged untruthfulness in the interview of Lieutenant Maxson in the investigation of Allegations A and B, was not brought up in the hearing.

57.    In the Notice of Termination, dated 02-18-97, there is no additional notice as to the facts alleged against Plaintiff, such as to provide reasonable notice of what alleged misleading or false statements were made in what context. This Notice of Termination does not cure inadequate notice given to Plaintiff prior to termination.

58.    The failure to tape record statements of witnesses Dickson, LaFramboise, Arnold, Bevier, Alex, Gilbert and Tobiason violated F.M.11.104. Lieutenant Maxson admitted that he should have tape-recorded such interviews. Only witnesses whose versions of events supported Brant's version were recorded. This, potentially, deprived Plaintiff of corroborative or exculpatory information and was prejudicial.

59.    The immunity agreement between the office of the Ada County Prosecuting Attorney, negotiated with Lieutenant Maxson, assuring Brant immunity from criminal prosecution in return for assistance in the investigation of Plaintiff, violated F.M.2.208, which prohibits any arrangement to allow a person to escape the penalty of the law.

60.    The investigation by Lieutenant Maxson violated F.M.11.202., which prohibits favor or prejudice in investigations conducted for purposes of disciplinary action or

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 14**

disciplinary action based on arbitrariness, supposition, or unfounded complaints of personal bias or prejudice.

61.     The investigation violated F.M.11.002, in failing to protect Plaintiff from false allegations by adhering to standardized investigative procedures, carried out in a conscientious and objective manner, and, otherwise, by having conducted the investigation in a fair and open manner with truth as its primary objective.   The investigation unreasonably: accorded weight to the statements of Brant and Wiseman; unreasonably attributed willfulness to misstatements by Plaintiff, for example, with respect to Plaintiff's having forgotten about speaking with Ms. Wiseman at the scene; and exaggerated the materiality of statements relating to whether Plaintiff personally called the office of Probations and Paroles from the stop scene.   Investigating officer, Lieutenant Maxson distorted Plaintiff's reporting that Brant later tested positive for meth, to discredit Plaintiff's reporting that Brant had admitted, while at the traffic stop, to using meth earlier that morning.

62.     Chief of Police Paulson admitted that he believed that the Field Manual policies were discretionary, such belief based upon instruction by Susie Mimura, City Attorney, and Bill Nary, Deputy City Attorney.   Nothing on the face of the Field Manual policies indicates that the procedures are other than mandatory where so indicated by the plain meaning of each policy.

63.     Plaintiff had the right to have the Department follow mandatory policies, including but not limited to the following:  F.M.11.104, 11.205, 11.207, 11.208, 11.109, 11.117, 11.107, 11.206.  Such policies, in whole or in part, were not followed by the Department.

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 15**

64.    Pursuant to the Collective Bargaining Agreement, 1997-2000, City of Boise – I.B.P.O. No. 486, the City appointed its Special Hearing Officer, William G. Harrigfeld, Esq..

65.    Between September 22, 1998 and December 9, 1998, Hearing was held under the terms and conditions of the Collective Bargaining Agreement.  The Hearing Officer ruled in favor of Plaintiff and issued Hearing Officer's Findings of Facts, Conclusions of Law and Order.  Exhibit A to Verified Complaint.

66.    The findings of the Hearing Officer supplanted and replaced the Decision of the Chief of Police, Larry Paulson, in terminating Plaintiff and constituted collateral estoppel as to the issues of fact litigated between the parties, as a matter of law.

67.    Though Mr. Harrigfeld issued his Hearing Officer's Findings of Fact, Conclusions of Law and Order on March 22, 1999, there has yet to be held an arbitration hearing under the terms of the Collective Bargaining Agreement, due to no fault of Plaintiff.

68.    Plaintiff continues to suffer harm as a result of the delay in the implementation of the appeal.

69.    The City has failed, further, to prepare an Administrative Record.  Upon request of Plaintiff, and at Plaintiff's cost, in whole or part, an Administrative Record has been prepared, including a Certified Transcript.  However, tapes and other evidence is missing from the record, having not been preserved by the City during and/or after the Administrative Hearing, depriving Plaintiff of a complete record on appeal under the terms of the Collective Bargaining Agreement and in this present action.

70.    The failure to preserve the record and the secreting of evidence requested but not

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 16**

provided before the Grievance Hearing, constitutes further actionable conduct on the part of Defendants and violates Plaintiffs rights to due process of law and contract.

71.    The Hearing Officer found that Plaintiff was entitled to have his disciplinary action rescinded and ordered reinstatement with pay and benefits and other reasonable remedial measures as the prevailing party before the City's Special Hearing Officer. That Order has not been overturned or amended. And, the delay in the implementation of that Order further harms Plaintiff in such manner as otherwise alleged in this Verified Complaint.

72.    The Hearing Officer found that the termination of Plaintiff was not only without proper cause, but it was without any reasonable basis in fact or law.

73.    Between September 1, 1997 and February 22, 1997 and continuing to the present, all individual Defendants participated in an investigation of Plaintiff and disciplinary procedure, grievance procedure and arbitration appeal procedure, conducted recklessly and in such a manner as to deprive Plaintiff of constitutional rights to pretermination or post-termination due process, procedural and substantive, in violation of clearly established and generally accepted standards of law applicable under the circumstances and express terms of City policy and the Collective Bargaining Agreement to which Plaintiff is a party.

74.    Procedural deprivation included but not limited to:  Plaintiff was not adequately allowed to confront witnesses or evidence, such being withheld and secreted, in his defense, to provide evidence, to have adequate prior notice of allegations against him, to avail himself to right of counsel, to adequately explain his version of the facts or

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 17**

otherwise to exercise the grievance and appeal procedures provided pursuant to and in a manner required by the policies and procedures of Defendant The City of Boise, and/or the provisions of the Collective Bargaining Agreement, by law and contract.  Further, the conduct of Defendants was biased, pretextual, arbitrary and capricious and done in furtherance of conspiracy to violate Plaintiff's civil rights and due process of law.

75.     Defendants Maxson, Webb and Compton provided perjured and false testimony at the Grievance Hearing.

76.     Defendant Nary provided false and  misleading information at the Grievance Hearing, withheld vital evidence and admitted to counseling his clients, the City and other Defendants, to do acts which violated Plaintiff's rights in denying Plaintiff procedures required by due process and contract, in violation of clearly established law.

77.     Defendant Mimura withheld vital evidence and admitted to counseling his clients, the City and other Defendants, to do acts which violated Plaintiff's rights in denying Plaintiff procedures required by due process and contract, in violation of clearly established law.

78.     Plaintiff has a property interest in his continuing employment protected by the U.S Constitution, the Constitution of the State of Idaho and other law, Federal and State, as well as by contract.

79.     The conduct of Defendants was done intentionally, willfully and recklessly.

80.     The actions of Defendants caused Plaintiff humiliation, loss of reputation, loss of wages and benefits and other incidents of employment to which Plaintiff was entitled,

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 18**

past and future, extreme emotional distress and interfered with Plaintiff's prospective economic opportunities.

## COUNT 1.

## BREACH OF CONTRACT AND IMPLIED TERM OF GOOD

## FAITH AND FAIR DEALING

81.    Plaintiff incorporates each and every allegation contained in paragraph 1 through 80 above.

82.    Defendants extended promises to Plaintiff as inducement for his employment, and Plaintiff relied upon promises, procedures, policies, rules and regulations, in reasonable expectation of receipt of compensation, benefits and protections provided thereby, abandoning pursuant of alternative employment and rendering services to Defendant The City of Boise, all to his detriment.

83.    Defendant The City of Boise provided employee handbooks, policy manuals, personnel policy statements and procedures, terms of a Collective Bargaining Agreement, and City ordinances, which, among other things, offered Plaintiff benefits, protections and entitlements as contractual incidents of his employment.

84.    In failing to observe the terms of the contract, as described above, and in wrongfully terminating the employment of Plaintiff, Defendants unlawfully caused the breach of the contract of employment with Plaintiff and violated the implied covenant of good faith and fair dealing.   Plaintiff had a right not be fired for conduct which comported with the terms and conditions of his employment.

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 19**

## COUNT II.

## DUE PROCESS DEPRIVATIONS

85.     Plaintiff incorporates each and every allegation and statement contained in paragraph 1 through 84 above.

86.     This cause arises under the United States Constitution, the Idaho Constitution, and federal statutes, particularly 42 U.S.C. 1983 and 1985, and Article I § 13 of the Constitution of the State of Idaho.

87.     The conduct of Defendants deprived Plaintiff of rights, privileges and immunities secured to him by the Constitution of the United States and by the Constitution of the State of Idaho, including but not limited to as follows:  The rights not to be deprived of life, liberty or property without due process of law and to equal protection of the laws.

## COUNT III.

## TORTIOUS CONDUCT

88.     Plaintiff incorporates each and every allegation and statement contained in paragraph 1 through 87 above.

89.     By Defendants' conduct, Defendants defamed Plaintiff, tortiously interfered with his prospective economic advantage and intentionally inflicted emotional harm upon him.

90.     The conduct of each individual Defendant was done intentionally, willfully, and with a gross disregard to acceptable standards of conduct, justifying an award of damages, as conduct of a nature shocking to the public conscience.

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 20**

DAMAGES

91.    Plaintiff has been injured by Defendants' acts, suffering mental distress, nervous disorder and physical manifestation of stress symptoms, by loss of wages, benefits and other incidents of employment and lost economic opportunity, by damage to reputation, and otherwise to be proven at trial, in an monetary value to be proven at trial.

92.    By reason of Defendants' wrongful conduct alleged, Plaintiff has been required to engage the services of an attorney and has and shall continue to incur costs, expenses and fees related thereto and is entitled to reasonable reimbursement of such costs and expenses in an award of attorney fees.


WHEREFORE, PLAINTIFF PRAYS:

1.    Past and future special damages.

2.    General incidental and consequential damages as may be proven at trial in an amount in excess of the jurisdictional, amount in controversy threshold.

3.    For an order reinstating Plaintiff with full back pay and benefits and implementation of the Hearing Officer's Order in all respects.

4.    For attorney fees and costs as may be allowable by law, pursuant to 42 USC §1988, I.C. 12-120(3), Rule 54, IRCP and otherwise as may be allowable by law.

5.    For injunctive relief, such that Defendants, and each of them, are ordered to cease the conduct alleged, to cease maintaining personnel related policies, files and records developed and maintained in violation of Plaintiff's rights, and otherwise as may be shown reasonable and remedial in the premises.

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 21**

6.     For such other and further relief as the Court deems just and equitable in the premises.

## DEMAND FOR JURY TRIAL

Plaintiff, CHRISTOPHER T. BERRY, by and through his attorney of record, BRIAN DONESLEY, hereby DEMANDS TRIAL BY JURY of all issues so triable in this action.

DATED This ___ day of November, 1999.

Brian Donesley
Attorney for Plaintiff

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 22**

## VERIFICATION

STATE OF IDAHO )
                       ) ss.
County of Ada      )

      CHRISTOPHER T. BERRY, being first duly sworn on oath, deposes and says:

      That he is the Plaintiff in the above-entitled action; that he has read the foregoing Complaint, knows the contents thereof and believes the same to be true.

_____

CHRISTOPHER T. BERRY
Plaintiff

      SUBSCRIBED AND SWORN to before me this _12th_ day of November, 1999.

_____
Notary Public in and for the State of Idaho
Residing at: _Boise, Id_
Commission Expires: _10/9/2002_

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - PAGE 23**

APR  1 1999

IN THE MATTER OF THE
GRIEVANCE OF CHRISTOPHER T.
BERRY BEFORE THE BOISE CITY
HEARING OFFICER UNDER THE
COLLECTIVE BARGAINING
AGREEMENT, 1997-2000, CITY OF
BOISE/I.B.P.O.  NO. 486

CHRISTOPHER T. BERRY

Grievant,

v.

BOISE CITY POLICE DEPARTMENT,

Respondent.

**HEARING OFFICER'S FINDINGS OF
FACT, CONCLUSIONS OF LAW AND
ORDER**

This matter is before the Hearing Officer under the Collective Bargaining Agreement by Christopher Troy Berry, grieving his disciplinary termination as a Police Officer II. The grievance came on for hearing commencing September 22, 1998, continuing on scheduled days until December 9, 1998. The Grievant appeared in person with his attorney, Brian Donesley. The City (hereinafter, the "Department"), appeared through its attorney, Bill Nary, Deputy City Attorney.

### FINDINGS OF FACT

1.

Grievant had been employed at the Department as a Police Officer for approximately two and one half years, when he was notified, on February 18, 1998, that his employment was terminated, by a letter from the Chief of Police, Larry Paulson. That letter referenced a prior letter, dated February 12, 1998, which provided a detailing of "sustained allegations."

HEARING OFFICER'S FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER—P. 1

EXHIBIT A.

2.

The allegations were enumerated A through I, as follow:

**ALLEGATION A: Performance, F.M.2.102.**

Officer Berry knowingly made a traffic stop on December 16, 1997, without notifying dispatch in direct violation of instruction and counseling he had previously been given by Sergeant Compton and Lieutenant Webb.

**ALLEGATION B: Insubordination, F.M.2.304.**

Officer Berry made a traffic stop without checking out with dispatch. Sergeant Compton asked him why he did not check out and Officer Berry replied that he had checked out on Channel E or 5 and that dispatch did not copy his traffic. Approximately 15 minutes later Sergeant Compton again met with Officer Berry and asked him if he was being totally honest about trying to check out on Channel E. Officer Berry stated that he was being honest. Officer Berry ultimately admitted that he had lied to Sergeant Compton about checking out with dispatch because he was scared. Officer Berry had also lied to Sergeant Compton about a car following him regarding a MDT message he had inadvertently sent to him.

**ALLEGATION C: Truthfulness, F.M.11.108.**

Officer Berry was not honest in a formal interview with Lieutenant Maxson during the course of an internal investigation regarding Allegations A and B.

**ALLEGATION D: Notification of Illness or Injury, F.M.2.106.**

On 12-21-97, Officer Berry called Ada County records to report that he was going to be off that evening because of sickness. Sergeant Compton was available at his home that afternoon. His watch commander, Lieutenant Webb is available all the time via his home telephone or department pager.

**ALLEGATION E: Performance F.M.2.102.**

Sergeant Compton has documented incidents that constitute repeated below standard performance and an unwillingness to change in his interpersonal skills. This is ultimately evidenced in Officer Berry's statements to Sergeant Compton when he is trying to work through an issue that Officer Berry had sent Sergeant Compton an MDT message requesting the sergeant pull a report for him.

**ALLEGATION F:  Department Records, F.M.2.115.**

Officer Berry completed an official police report that included statements that were misleading and false.

**ALLEGATION G:  Performance F.M.2.102.**

Officer Berry had no right to further detain Dennis Brant beyond the initial questioning.  Officer Berry had no reasonable suspicion to pat search Brant and did not have the right to go through his wallet.  Later in the contact, Officer Berry observed the ignition was punched out of the vehicle Brant was driving.  That would have given him suspicion to continue a line of questioning about the issue.  Officer Berry ran a registration check on the vehicle and it came back registered to Brant, which eliminated the suspicion that the vehicle may have been stolen.

**ALLEGATION H:  Conformance to Laws F.M.2.302.**

Officer Berry recorded false and misleading information in his arrest report that was filed and used by the Ada County Prosecutor in criminal court proceedings against Dennis R. Brant in violation of ISC 18-3201 or 18-2602.

**ALLEGATION I:  Conformance to Laws F.M.2.302.**

Officer Berry testified falsely during a preliminary hearing in violation of ISC 18-5401, 5406 and 5408.

3.

The grievance was timely filed on February 23,1998.

4.

The Union Grievance Committee approved the grievance and sent it to the Chief of Police timely.

5.

The Chief of Police responded to the grievance in writing, denying the grievance.  A Hearing Officer was appointed by the City and instructed to proceed with hearing.

6.

The Boise Police Department Field Manual is written in mandatory terms. Its mandatory provisions are not discretionary. The mandatory procedures in the Field Manual are just that, not discretionary.

7.

The investigation violated **F.M.11.002**, in failing to protect Grievant from false allegations by not adhering to standardized investigative procedures, carried out in a conscientious and objective manner, and, otherwise, by having conducted the investigation in a fair and open manner.

8.

The Chief of Police is required to appoint an Office of Professional Standards Senior Investigator. He did so, appointing Lieutenant Maxson, who served for approximately four years in that capacity.

9.

Among the purposes of **F.M.11.206** is to ensure the fair and uniform administration of disciplinary action throughout the Department. This policy requires consistency of application and the concept of proportionality.

10.

**F.M.11.205** requires that disciplinary action be initiated through a disciplinary action report (DAR). No DAR was written with respect to **Allegations A through I**. Nor were recommendations from supervisors received, as required in **F.M.11.205**. Moreover, Grievant was not given the opportunity to explain his position by a written response within three days of a copy of a DAR; no DAR was provided, in violation of **F.M.11.205**

HEARING OFFICER'S FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER—P. 4

11.

Chief of Police Paulson admitted that he believed that the Field Manual policies were discretionary. Nothing on the face of the Field Manual policies indicates that the procedures are other than mandatory where so indicated by the plain meaning of each policy.

12.

Grievant has the right to have the Department follow mandatory policies, including but not limited to the following: **F.M.11.104, 11.106, 11.107, 11.112, 11.202, 11.205, 11.206 11.207, 11.208.**. Such policies, in whole or in part, were not followed by the Department.

13.

**F.M.11.207** requires that a disciplinary order (DO) be used to record all formal disciplinary actions. A written copy of a DO is required to be given to the member, with the member provided thirty (30) days after receipt to respond in writing. No DO was prepared in **Allegations A through I**. While the forms provided in (Addendum A) to **F.M.11.106**, are not mandatory, per se, the alleged DAR and DO presented by the Department, did not comport substantially with the formatting, and the procedures were not followed with respect to notice to Grievant and procedures involved.

14.

On 12-15-97, Grievant checked out at a traffic stop at Liberty and Emerald. His supervisor, Sergeant Compton, spoke to Grievant at the scene about traffic safety issues relating to checking out at a traffic stop on his hand held radio.

15.

Sergeant Compton, at that time, told Grievant to never again exit his police vehicle at a traffic stop without first checking out with dispatch. Grievant had been instructed by Lieutenant Webb several weeks prior, that he needed to start checking out before exiting his vehicle.

The Hearing Officer finds that Officer Berry's prior unit commander, Officer Nashatami, felt it was okay to not check out before exiting a vehicle in situations where a police officer's safety was a question.

16.

Hearing Officer also finds that there was a personality conflict between Grievant and Sergeant Compton which caused a communication breakdown.

17.

On 12-16-97, Grievant made a traffic stop at a Maverick station on Ustick and Cloverdale. The driver exited his vehicle immediately. Grievant immediately exited his own vehicle, for traffic safety purposes, without checking out with dispatch. Sergeant Compton arrived immediately and checked out on his radio for both himself and Grievant.

18.

Officer Compton asked Grievant why he did not check out. Officer Compton felt that Grievant was lying to him because Grievant stated that he had "tried" to check out on 5. Grievant's version is that he tried to check out, however he was on wrong channel and had to exit immediately before he could check out.

The Hearing Officer finds that there was miscommunication between Sergeant Compton and Grievant.

HEARING OFFICER'S FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER—P. 6

19.

Approximately fifteen minutes later, Sergeant Compton asked Grievant if he had been totally honest about trying to check out on the car radio. Officer Berry said he was honest and that he had "tried" to check out.

20.

Also, shortly after the traffic stop, Grievant had sent a mobile data terminal (MDT) message to Sergeant Compton to explain that somebody was following Grievant in a car. Sergeant Compton later accused Grievant of lying about the event and of having sent Sergeant Compton the MDT message inadvertently, intending that the message would be insulting to Sergeant Compton. The message was sent inadvertently, according to Officer Berry, though Officer Berry originally intended to send the message to Sergeant Compton, he changed his mind and sent it to another officer, sending it to Sergeant Compton only by mistake. The Grievant testified that he did not intend to insult Sergeant Compton and appears to have described events which he believes did occur.

21.

There is no official policy requiring checking out with dispatch before making a traffic stop. This is a matter of discretion, based upon officers safety considerations. However, Officer Berry had a duty to follow his sergeant's orders and check out as his sergeant requested.

22.

There is evidence that Grievant had previously been counseled by Officer Webb that he should be checking out before exiting his vehicle at a traffic stop; however, there was no evidence presented that the Grievant had been given a prior PPC for failing to check out.

The Hearing Officer finds that Grievant had never been told by prior Unit Command Officers that he must check out before exiting the vehicle; therefore, Officer Berry was having to learn a new procedure.

23.

No officer has previously been terminated for failing to notify dispatch before exiting a police vehicle at a traffic stop. Nor was any evidence presented that any officer has ever been disciplined for such action.

24.

Subsequently, in an investigative interview, after having been cautioned by a union representative assisting Grievant that he would be fired if he did not agree with Lieutenant Maxson, the Office of Professional Standards Senior Investigator, Grievant made conciliatory statements. Such statements did not, constitute an admission of having lied to Sergeant Compton about checking out.

The Hearing Officer finds that any statements made by the Grievant, after the Grievant spoke with union representative Niccols, are considered by this Hearing Officer to be under improper influence that overbeared the will of the Grievant.

25.

Interviews of Grievant were conducted by Lieutenant Maxson twice. The first interview was on 12-23-97, involving **Allegations A and B**. The second was on 02-06-98, involving **Allegations A, B, C, D, E, F, G, H and I.**.

26.

The letter from Chief Paulson dated 02-12-98, providing notice of "sustained allegations," did not provide adequate detail of the subject matter of the alleged misstatements

HEARING OFFICER'S FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER—P. 8

or falsifications. The letter did not constitute a disciplinary action report (DAR), required by the Boise Police Department Field Manual.

27.

With respect to **Allegation C**, in the letter of 02-12-98, there was no Administrative Incident Report (AIR) or Special Investigation Report (SIR) done, in violation of **F.M.11.104.** An AIR and an SIR are required for all Class "A" or Class "B" Complaints.

28.

The Chief of Police testified that his primary concern was "truthfulness," especially with Lieutenant Maxson (**Allegation C**). Chief Paulson said that he would not have terminated Grievant's employment if he had not lied to Lieutenant Maxson.

29.

No officer has previously been terminated from employment for dishonesty or lying. One other officer was believed to have lied in an internal affairs investigation, allegations involving other conduct.

30.

Grievant was not made aware of any notations on his personnel performance charts (PPC), the purpose of which PPCs is to provided a record of unsatisfactory performance or problems, on an immediate and daily basis by supervisors, to provide notice of shortcomings in performance. Grievant had not received any PPC about: checking out with dispatch on the car radio; actually notifying personally his immediate supervisor upon calling in sick; or, answering "what" on the hand-held radio. Grievant had no negative comments in his PPC's or evaluations, as to the above issues.

31.

No officer has previously been terminated for not following the notification of illness or injury policy, **F.M.2.106**. No evidence was presented showing any officer has ever been disciplined for such action.

32.

That Officer Berry did not know the proper procedure for calling in sick and was in violation of departmental policy. However, Officer Berry relied on another officers knowledge as to proper procedure and did not knowingly violate department policy.

33.

On 12-21-97, Grievant called Ada County Records to report that he would be off work that shift because of illness. He called before the shift started. The message was given to Sergeant Compton, in writing, before the shift started. This was consistent with procedures actually practiced by some, in the Department.

34.

Grievant did violate written Department Policy by his activities with respect to notifying the Department of illness or injury. (**Allegation D and E**). However, he was told by other officers, dispatch was an acceptable way to call in sick.

35.

The Department offered no substantial evidence documenting its alleged "repeated below standard performance" or the alleged "unwillingness to change in his interpersonal skills." No officer has been terminated for such reasons previously. Sergeant Nakashima confirmed testimony by Sergeant Compton that Grievant would respond to constructive criticism and direction.

36.

That Officer Berry sent Sergeant Compton an MDT message requesting the Sergeant to pull the report for him because Officer Berry felt that Sergeant Compton had changed the report and he wasn't sure which report it was and he wanted to be able to see what changes were made.

37.

Grievant did not violate Department Policy relating to repeated below standard performance and an unwillingness to change in his interpersonal skills in sending Sergeant Compton an MDT message, as discussed herein above. (**Allegation E**).

38.

There existed between Sergeant Compton and Grievant, a personality conflict. Grievant complained about the situation, through the chain of command, to Lieutenant Webb, Sergeant Compton's supervisor. No investigation was conducted. No remedial action was taken. Lieutenant Webb testified that he believed the personality conflict was "in his head," referring to Grievant. Others testified there was an obvious personality conflict between Sergeant Compton and Officer Berry. This conflict was further enhanced by both Sergeant Compton and Officer Berry's failure to communicate. Sergeant Compton violated Boise City Police Manual 1-405, Command Responsibilities, by not striving to create and maintain a positive attitude and respect amongst his personnel. Sergeant Compton is to lead by example.

39.

Officer Berry had no probable cause to stop Brandt for a second time on 8-15-98.

40.

No officer has previously been terminated for performance failures pursuant to F.M.2.102, in relation to search and seizure procedures. The original stop of Brant, was a violation of Brant's Fourth Amendment rights. When stopped, Officer Berry had reasonable suspicion, after talking with Brant, that he was under the influence of some type of drug. Officer Berry had seen Brant drive; therefore, there is a possibility that Brant had violated Idaho Code § 18-8004.

That Officer had reasonable suspicion to *Terry* pat the suspect, Brant. The search of the Brant vehicle was based upon plain view of contraband.

The search was conducted on that basis under the authorization of Sergeant Compton. Pat Owens  testified that he had enough to proceed forward with this case pursuant to the plain view doctrine.

Additional authority for the search may have existed pursuant to: consent to search given by Brant; search incident to arrest; and, vehicle inventory search.

41.

The official police report filed by Grievant in relation to the Brant stop of 08-15-98, did include false and misleading statements; however, these statements were not knowingly made.

That Grievant discovered these mistakes upon listening to the tape and explained the problem to the prosecutor.

That Deputy Prosecutor Pat Owens felt these mistakes did not damage his case.

Grievant did not knowingly testify falsely during the Brant preliminary hearing. The letter of 02-12-98, describing "sustained allegations" in support of the Department's case,

HEARING OFFICER'S FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER—P. 12

does not purport that such falsifications or misstatements were made knowingly. Grievant did not knowingly make such false statements. Grievant did go to the preliminary hearing unprepared.

42.

The City did not prove Grievant knowingly gave false and misleading information on the arrest report used in the criminal court proceedings.

43.

City did not prove the Grievant knowingly testified falsely during the Brant preliminary hearing. Grievant realized, after reviewing the tape of the traffic stop, in preparation for the suppression hearing, that he had forgotten that he had, a brief conversation with a witness (Wiseman), at the scene of the stop. Grievant pointed this out to the prosecuting attorney (Pat Owen), who told him that it was "no big deal." Any misstatement at the preliminary hearing was insubstantial and immaterial and could be clarified at the suppression hearing.

44.

At hearing, Grievant testified personally. Neither Brant nor Wiseman appeared. The reported statements of Brant and Wiseman were hearsay and, under the circumstances, involving a use immunity agreement having been entered into by the Office of Prosecuting Attorney, diminishes the weight of Brant or Wiseman testimony.

45.

Sergeant Compton testified. His testimony corroborated Grievant's testimony as to events at the traffic stop of Brant, except insofar as Sergeant Compton stated that he did not tell Grievant that P.O. LaFramboise stated that he would authorize a search under the terms

HEARING OFFICER'S FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER—P. 13

of Brant's probation at the scene. However, it was later testified that LaFramboise did call while Grievant was at the jail and authorize the search. Based upon Sergeant Compton's testimony and his admission that the search was conducted under the plain view doctrine, such difference between Sergeant Compton's testimony and Grievant's reports is insubstantial. There is no evidence that a knowing misstatement was made by Grievant.

46.

Officer Arnold and Bevier's statement, corroborated Grievant's version that no search occurred until after the arrival of Sergeant Compton, Officer Arnold and Officer Bevier, who arrived approximately the same time as Ms. Wiseman arrived.

47.

Grievant did not search the Brant vehicle until the plain view search was done by Grievant, Sergeant Compton, Officer Arnold and Officer Bevier.

48.

**Allegation C** of the letter of 02-12-98, which the Department purports to be the DAR, does not specify the false statements allegedly made by Grievant, nor upon what report Grievant was believed to have knowingly made false statements. **Allegation C** is not supported by an AIR or a DAR. The substance of **Allegation C**, relating to alleged untruthfulness in the interview of Lieutenant Maxson in the investigation of **Allegations A and B**, was not brought up in the hearing.

49.

In the Notice of Termination, dated 02-18-97, there is no additional notice as to the facts alleged against Grievant, such as to provide reasonable notice of what alleged misleading

or false statements were made in what context. This Notice of Termination does not cure inadequate notice given to Grievant prior to termination.

50.

The failure to tape record statements of witnesses Dickson, LaFramboise, Arnold, Bevier, Alex, Gilbert and Tobiason violated **F.M.11.104**. Lieutenant Maxson admitted that he should have tape-recorded such interviews. This, potentially, deprived Grievant of corroborative or exculpatory information.

51.

Upon motion of Grievant, the hearing was closed to the public with witnesses excluded.

52.

Objections to hearsay evidence were waived by the parties, other than as to the weight of the evidence.

53.

The hearing Officer maintained an audio tape recording of the proceedings of the hearing.

54.

The parties waived timeliness with respect to conduct of the hearing.

CONCLUSIONS OF LAW

1.

The Hearing Officer has jurisdiction of this grievance of a disciplinary termination under the provisions of the Collective Bargaining Agreement.

2.

HEARING OFFICER'S FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER—P. 15

The Department has the burden of proving by a preponderance of the evidence that there was a proper cause for the disciplinary termination of Grievant.

3.

Notice to an employee of a disciplinary termination must indicate cause and reasons in writing. The purpose of the grievance procedure is to give the employee an opportunity to respond to the charges against him, based upon the reasons given for the actions being taken. The grounds and reasons for disciplinary termination in this case are limited to those which are reasonably described in the letter of 02-12-97 from Chief of Police, Paulson, to Grievant. The grounds alleged are those "sustained allegations" described in paragraph II above.

4.

That the contents of the Boise Police Department Field Manual are considered policy. The second page of the Boise City Field Manual (hereinafter "Field Manual") contain a letter from Larry A. Paulson, Chief of Police. Within that letter, Chief Paulson writes:

Part A:

> "As we face the future, the Field Manual (both Operational and Administrative Orders) will be an increasingly important tool. Its purpose is to provide a standard and a structure within which individuals can exercise their various talents. This standard is of utmost importance in helping you and me, the members/employees of the Department, to achieve and maintain excellence, i.e. a level of operation which is sound, legal, effective and efficient.
>
> The Field Manual represents substantial research and input by many members of this Department. It is not a static document and will always be the subject of continuing review and change as needed. In the final analysis it ultimately constitutes my written order about the manner in which members and staff are to conduct the business of the Department. It is my expectation that each of you will endeavor to carry out these orders, exercising good judgement and a spirit of professionalism."

5.

To terminate an employee the Boise City Police Department must follow the procedures set out in FM §11.104 .1 which reads as follows:

**Class A** - Complaints in this category are considered potential major abuses of position, major policy violations, and other major issues including alleged crimes, EEOC violations, civil rights violations, incidents involving substantial civil liability, etc.

In differentiating Class A complaints (from Class B or C), the following criteria apply:

a.   Full investigation and completed staff report in specialized topical format (See F.J. 11.106 Addendum). The Special Investigations Report (SIR) face sheet, BPD-137-ADP, is mandatory.

b.   Mandatory legal notification and review due to civil and/or criminal liability.

c.   Taping of all interviews.

d.   Managed and tracked through OPS with assigned control number.

e.   If sustained, could result in higher levels of discipline up to and including termination.

f.   Disciplinary Action Report shall be utilized if sustained.

g.   Written response from Chief of Police to complainant upon receipt of and final disposition of case.

h.   Written response from the Chief's Office to the involved member notifying him of the outcome of the investigation

FM §11.104.2 reads as follows:

**Class B:** Complaints in this category may include minor abuses of position, failure to perform, conflict of interest allegations, differential treatment of citizens, demeanor complaints in which specific violations are noted, etc.

Under Class B complaints, the requirements are as follows:

a.   An abbreviated investigative staff report which follows a specialized outline (See F.M. 11.106 Addendum). The SIR face sheet or A.I.R. is normally required.

**HEARING OFFICER'S FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER—P. 17**

b       Managed and tracked through OPS with an assigned control number.

c.      Legal review is discretionary based upon investigator and/or OPS analysis.

d.      If sustained, could result in minimal civil liability; involves allegations in which criminal prosecution is not a consideration.

e.      If sustained, could normally result in discipline less than termination.

f.      Taping of all interviews.

g.      Documented telephone notification or written response from the Division Commander or designee to the complainant upon receipt of and final disposition of the case.

h.      Disciplinary Action Report shall be utilized if sustained.

I.      Written response from the Chief's Office to the involved member notifying him of the outcome of the investigation.

6.

Under the internal complaint classification system, all reviews conducted under Class A and Class B complaints are required to be tape recorded. During the investigative process of the case at hand, the following witness interviews were not tape recorded: P.O. Dickson, P.O. La Framboise, Officer Arnold, Officer Bevier, Detective Alex Gilbert, and Steve Tobiason. Failure to tape record these interviews violates subsection c. of 11.104.1 and subsection f. of 11.104.2.

Further, no Administrative Incident Report (AIR) or Special Investigation Report (SIR) was provided under Allegation C of the February 12, 1998 letter from Chief Paulson to Grievant.

The Hearing Officer finds that proper procedure was not followed for either a Class A or Class B investigation.

FM §11.205 Processing Formal Disciplinary Actions, reads as follows:

**HEARING OFFICER'S FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER—P. 18**

1.      All formal disciplinary actions against a member of the Department shall be instituted through the Disciplinary Action Report (DAR). The report shall be initiated by OPS upon a (sustained) finding of misconduct. The DAR shall never be placed in a member's ASD personnel file.

2.      Prior to securing the recommendation of the member's supervisor, the division commander or his designee shall provide a copy of the DAR to the member.

3.      The supervisors and commanding officer of the involved member will make recommendations in the DAR regarding disciplinary action to be taken (unless said command staff have also been directly involved in the incident requiring discipline) and forward it to the discipline coordinator.

4.      The member shall have the opportunity to explain his position by submitting a written response to the Chief through the chain of command within 3 days of his receipt of a copy of the DAR. Any written response shall be retained with the copy of the DAR.

5.      The OPS Senior Investigator, after recording his comments on the DAR, shall forward it to the Chief of Police for review and final action.

On February 12, 1997 Grievant received a letter from Chief Paulson outlining the nine

allegations which formed the basis for the investigation. Both Lieutenant Maxson and Chief

Paulson testified that this February 12, 1997 letter constituted the DAR. The letter format

DAR was implemented in 1994 by the Boise City Attorney's Office and has apparently been

used ever since. The Hearing Officer does not have a problem with the format of the DAR

other than the fact that Officer Berry received the DAR and was not notified that the letter

constitutes a DAR and that he has 3 days to respond to such DAR.

7.

The Department found in Allegation A; Performance FM 2.102, that Officer Berry

knowingly made a traffic stop on December 16, 1997 without notifying dispatch in direct

violation of instructions and counseling he had previously been given by Sergeant Comstock

and Lieutenant Webb is sustained.

Due to the departments' failure to follow procedure pursuant to a Class A, Class B complaint, the department cannot punish Officer Berry other than what he could received under a Class C complaint. This Hearing Officer reads a Class C violation sanction as being a PPC, counseling, and remedial training to correct behavior to reinforce satisfactory performance.

8.

Allegations found in Allegation B: Insubordination F.M. 2.306, are not sustained pursuant to:

Field Training Manual 1.405 - Command Responsibilities.

"Each Supervisor shall strive to create and maintain a positive attitude and respect among the personnel. He should lead by example."

and

Field Manual Section 1.409 - Manner of Giving Orders and Instructions.

"The supervisor shall use tact in giving orders and correcting mistakes. He should test the understanding of instructions with care so that subordinates know in detail what they are to do and how to do it, and, if desirable, the reasons therefore."

As was testified to several times that Officer Berry and Sergeant Compton had a personality conflict. It is this hearing officers belief that because of this personality conflict Officer Compton allowed his personal dislike for Officer Berry to stand in the way of effective communications, thereby violating Field Manual Sections 1-405 and 1-409.

9.

The allegations the Department found in Allegation C - Truthfulness, F.M. 11-108 are not sustained . The Idaho Court of Appeals in State vs. Wilker, 932P.2d 924, 129 Idaho 805, 808 Court of Appeals, (Ct. App. 1997) sums up the law in the State of Idaho as to voluntary confessions when it states:

HEARING OFFICER'S FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER—P. 20

"The burden is upon the state to show, by a preponderance of the evidence, that a defendant's confession was voluntary. (citations omitted). The voluntariness of a confession must be measured by a "totality of the circumstances" test. (citations omitted) For a defendant's statement to be involuntary, the defendant's will has to have been overcome by police conduct at the time he confessed. (citations omitted) If the defendant's free will is undermined by threats or through direct or implied promises that are not honored, then a statement cannot be considered voluntary, and is inadmissable."

Officer Berry's testimony was unrebutted., that before the second half of his interview with Lieutenant Maxson, Officer Nichols told Officer Berry that he better tell Maxson what he wants to hear because Officer Maxson plans on firing him. Officer Berry's free will was undermined by this threat. This Hearing Officer therefore will not consider anything Officer Berry said in the second part of his interview with Lieutenant Maxson.

10.

The allegations of the Department found in Allegation E - Proven Performance F.M.2.102.

This Hearing Officer <u>exonerates</u> Officer Berry from any wrongdoing. As shown through testimony, before Officer Berry was on Officer Compton's shift, he was considered an above average, aggressive, police officer that had made mistakes. Prior Commanders of Officer Berry stated that he was a good officer that would question supervision however, would do what he was told, and was always willing to try to improve on interpersonal skills. Officer Berry stated the reason he sent Officer Compton an MDT message requesting him to pull a report, was that he knew Officer Compton had made some changes. Officer Berry did not know which report this was. Officer Berry would have to testify to the truthfulness of the report. Nowhere in the policy manual is it inappropriate for an officer to ask a sergeant to pull a report for him. Officer Compton found this request appalling; however, failed to tell Officer Berry about his attitude toward Officer Berrys request. Pursuant to **F.M. 1.405 and**

HEARING OFFICER'S FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER—P. 21

**1.409** Sargent Compton should have explained, in private, the problems he had with Officer

Berry's request.

11.

The allegations the department alleges in **Allegation F**: Department Records, F.M..

2.115 are not sustained.

F.M. 2.115 - Department Records:

"Members and employees shall submit all necessary reports on time. No member or employee shall knowingly enter or cause to be entered an inaccurate, false, or improper information or data, or misrepresent the facts in any department records or reports. Reports shall be completed in accordance with department report writing procedures."

Officer Berry testified that he was forced to get the report done immediately and that

Parole Officer LaFramboise did call at the police station okaying a search pursuant to Brant's

Fourth Amendment waiver. However, Officer Berry also stated that he mistakenly put in his

report that he personally talked to LaFramboise at the scene. This was a mistake and not an

intentional action. This evidence was unrebutted, therefore this Hearing Officer finds Officer

Berry did not knowingly enter a false police report. The city did not put on any evidence

indicating that Officer Berry knowingly entered a false police report, nor did the complaint

allege that Officer Berry knowingly caused to be entered any inaccurate or false testimony.

Therefore this Hearing Officer, as stated before, finds the allegations unsubstantiated on two

grounds. One, the State never proved that Officer Berry knowingly entered a false police

report nor did the city allege Officer Berry knowingly entered a false police report.

12.

Allegations of the Department found in **Allegation G**: Performance F.M. 2.102 is not

substantiated.

The Idaho Court of Appeals in *State vs. Reed*, 927 P.2d 893, 129 Idaho 503, 505, (Ct. App.) states.

"Stopping an automobile and detaining its occupants constitutes a "seizure" even if the purpose of the stop is limited and the detention quite brief. (citations omitted)

When such a stop is made for purposes of investigating possible criminal activity, it must be based upon specific articulated facts which warrant a suspicion that the person detained has been or is about to be engaged in criminal activity."

It is this Hearing Officer's belief that Officer Berry had no probable cause to stop Dennis Brant for the second time. However, we must look at Officer Berry's actions after the alleged stop, due to the fact that the alleged incidents of which Boise City brought action against Officer Berry is for Officer Berry's actions after the stop. Officer Berry testified that after speaking with Dennis Brant he felt the car may have been stolen due to the fact that the ignition switch had been popped out and that Dennis Brant was acting in a manner that coincided with the use of illegal drugs. Officer Berry testified that he has had the training and experience in the area of drug recognition and that he felt Mr. Brant was under the influence of drugs, which would have been a violation of Idaho Code Section 18-8004. Officer Berry also testified that he saw drug paraphernalia in plain view of the car. Therefore, excluding the original stop, Officer Berry had reason to further detain Dennis Brant. The legality of the second stop was not an allegation brought by the city, and therefore is not considered material to this decision.

13.

The allegations the department found in **Allegation 8**: Conformance to Law, F.M. 2.302.

Idaho Code Section 18-2601. Falsifying Evidence - Offering Forged or Fraudulent Documents in evidence. - Every person who upon any trial, proceeding, inquiry or investigation whatever authorized or permitted by law,

offers in evidence as genuine or true, any book, paper, document, record, or other instruments in writing, knowing the same to have been forged or fraudulently altered or annotated, is guilty of a felony.

Idaho Code Section 18-3201. Officer stealing, mutilating, or falsifying public records. - Any public officer, law enforcement officer, or subordinate thereof, who willfully destroys, alters, falsifies or commits the theft of the whole or any part of any police report or record kept as part of the official governmental records of the state, of any county or municipality in the state shall be guilty of a felony and is punishable by imprisonment in a state prison for not more than fourteen years.

"Idaho Code Section 18-101. Definition of Terms...

1.     "Willfully," when applied to the intent that which an act is done or admitted, implies simply the purpose or willingness to commit the act or make the omission referred to. It does not require any intent to violate the law, or to injure another, or to acquire any advantage.

       .....

5.     "Knowingly," imports only a knowledge that the facts exist which bring the act or the admission within the provisions of this code. It does not require any knowledge of the untruthfulness of such act or admission.

The city has failed to allege or to prove that Officer Berry knowingly recorded false or misleading statements. Officer Berry should in no way think his actions were proper. It is this Hearing Officers belief that Officer Berry needs to spend more time writing his reports and reviewing his reports before hearing or trial.

14.

The allegations stated in **Allegation I:** Conformance to Laws F.M. 2.302 that Officer Berry testified falsely at a preliminary hearing in violation of Idaho Code Section 18-5402, 5406, and 5408 is not sustained.

"Idaho Code Section 5401. Perjury defined.

Every person, having taken an oath that he will testify, declare, depose, or certify truth, before any competent tribunal, legislative committee, officer, or person in any of the cases in which such an oath may by law be administered, willfully and contrary to such oath, states as truth any material matter which he knows to be false, is guilty of perjury.

Idaho Code Section 5406. Ignorance of Materiality no defense. - It is no defense to a prosecution for perjury that the accused did not know the materiality of the false statement made by him; or that it did not, in fact, affect the proceeding in or for which it was made. It is sufficient that it was material, and might have been used to affect such proceeding.

Idaho Code Section 5408. Unqualified statement of unknown fact.-An unqualified statement of that which one does not know to be true is equivalent to a statement of that which one knows to be false.

The city has failed again to show that Officer Berry's statements were knowingly and willfully made. Again, Officer Berry should spend more time reviewing his reports before hearing or trial.

14.

The conduct of the investigation by the Department is characterized by repeated violations of the mandatory provisions of the Boise Police Department Field Manual as referenced herein. Generally, the investigation violated **F.M.11.202**, relating to authority and responsibility under disciplinary procedures.

15.

Upon a consideration of all of the evidence, and having observed the demeanor of witnesses, it is found that the Department has failed to prove by preponderance of the evidence that its disciplinary termination of Grievant was for proper cause.

16.

The action of the Department in terminating Grievant was not only without proper cause, but it was also without any reasonable basis in fact or law.

17.

Grievant is entitled to have his disciplinary termination rescinded.

18.

Under the provisions of the Collective Bargaining Agreement, Grievant is entitled to a final decision in this matter.  The Collective Bargaining Agreement, 1997-2000, City of Boise/I.B.P.O No. 486, Section 7.E.I.

ORDER

IT IS HEREBY ORDERED that the Department reinstate Grievant to his former position without loss of status or pay and without loss of benefits, and that the disciplinary termination be rescinded, as though such personnel action had not occurred.  Grievant shall be restored to pay, benefits, ordered reimbursed for unpaid medical expenses that would otherwise have been paid, including, but not limited to: any medical deductibles; lost allowances that would have been forthcoming to Grievant; reinstatement of lost vacation and sick leave; retirement benefits; wellness incentives; health insurance premium rebates; any other benefits or incidents; and, uninterrupted and continuous seniority entitlement.  Grievant shall be restored to the swing shift and provided with similar or identical equipment, uniforms, locker, or otherwise as he had at the time of termination.

It is strongly recommended that Grievant be provided with refresher training adequate to restore him fully to his responsibilities, concurrent with his reinstatement.

DATED this __2 2 $^{nd}$__ day of  March, 1999.

William G. Harrigfeld
Hearing Officer

HEARING OFFICER'S FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER—P. 26

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY That on this _32nd_ day of March, 1999, I caused an accurate copy of the foregoing document to be delivered as noted below to:

| | | |
|---|---|---|
| Mr. William L. M. Nary | U.S. Mail | |
| Deputy City Attorney | | |
| 101 South Capital Boulevard, Suite 700 | Hand Delivery | |
| P.O. Box 500 | | |
| Boise, Idaho 83701-0500 | Fax | ✓ |
| | | |
| Brian Donesley | U.S. Mail | |
| Attorney at Law | | |
| 604 North 16th Street | Hand Delivery | |
| Post Office Box 419 | | |
| Boise, Idaho 83701-0419 | Fax | ✓ |

_Connie Newman_
Secretary

## CERTIFICATE OF MAILING

I HEREBY CERTIFY That on this 31st day of March , 19
99 , I served a true and correct copy of the foregoing Hearing
Officer's Findings to:

Chief Paulson
7200 Barrister
Boise, Idaho 83704

William L.M. Nary
Attorney at Law
P.O. Box 500
Boise, Idaho 83701-0500

Dwayne Newkirk
City Hall
P.O. Box 500
Boise, Idaho 83701-0500


Brian Donesley
Attorney at Law
604 North 16th Street
Boise, Idaho 83701-0419

```
_____  Hand Delivery
_____X_____  U.S. Mail
_____  Federal Express
_____  Certified Mail
_____  Facsimile
```

_____
Secretary